IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CROWLEY MARITIME CORPORATION,   Jacksonville, Florida

        Plaintiff,   Case No. 3:16-cv-1011-J-32JBT

  vs.   June 20, 2017

NATIONAL UNION FIRE INSURANCE   10:04 a.m.
COMPANY OF PITTSBURGH, PA.,

        Courtroom No. 10D

        Defendant.
_____

MOTION HEARING
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE

COURT REPORTER:

      Shannon M. Bishop, RDR, CRR
      221 North Hogan Street, #150
      Jacksonville, Florida  32202
      Telephone:  (904)549-1307
      dsmabishop@yahoo.com

    (Proceedings recorded by mechanical stenography;
transcript produced by computer.)

PLAINTIFF'S COUNSEL:

       **JOHN D. SHUGRUE, ESQ.**
       **EMILY E. GARRISON, ESQ.**
       Reed Smith, LLP
       10 South Wacker Drive, 40th Floor
       Chicago, IL  60606-7507

       **CHARLES B. LEMBCKE, ESQ.**
       Law Office of Charles B. Lembcke, PA
       1300 Riverplace Boulevard, Suite 605
       Jacksonville, FL  32207

DEFENSE COUNSEL:

       **MICHAEL P. DUFFY, ESQ.**
       Peabody & Arnold, LLP
       600 Atlantic Avenue, 6th Floor
       Boston, MA  02210-2261

       **JASON BENJAMIN BLOOM, ESQ.**
       Lydecker Diaz
       19th Floor
       1221 Brickell Avenue
       Miami, FL  33131

1                    P R O C E E D I N G S

2    June 20, 2017                              10:04 a.m.

3                         - - -

4         COURT SECURITY OFFICER:  All rise.  The United States

5    District Court in and for the Middle District of Florida is now

6    in session.  The Honorable Timothy J. Corrigan presiding.

7    Please be seated.

8         THE COURT:  Good morning.  As you all can see, we

9    have some interns here.  Some of these folks work for the

10   federal court.  Others work for law firms and others around the

11   city.

12        And we have a program in which we invite them to come

13   in to observe court proceedings.  And they've already observed

14   a criminal sentencing with my colleague, Judge Howard.  And

15   today was their lucky day to observe a civil proceeding.

16        And since this argument seemed to be of the type that

17   was a legal argument that had elements to it that we thought

18   the students might be interested in, we've invited them to join

19   us today.  So what that means to the lawyers is you need to be

20   on your best behavior and show them how it's really done.

21        And for you, we welcome you.

22        I'm going to let counsel for Crowley, when he first

23   gets up, to just give me a brief statement of the case.  I

24   don't normally do that, because I already know what the case is

25   about, but -- but it will help you-all at least to have some

1    understanding.

2            It's essentially an insurance coverage dispute.  And

3    it has issues of potential application of res judicata, statute

4    of limitations, and some other subsidiary issues in it.

5            So I think once you start to hear the arguments,

6    you'll be able to follow along well.  And so hopefully it will

7    be interesting for you.

8            I've read, of course, all the briefing and a pretty

9    extensive record involving, as I said, a prior -- I don't know

10   if I did say, but there was a prior arbitration proceeding,

11   which is the basis for the claim that res judicata bars the

12   case.  And so you'll -- I think as you hear the arguments

13   develop, you'll be able to follow along.

14           And I actually -- I actually misspoke.  The moving

15   party is the insurance company.  Sometimes -- it depends on how

16   the case is set up.

17           But in this case the insurance company is moving for

18   summary judgment to have the court rule as a matter of law that

19   there's no coverage in the case.

20           And so the first attorney to argue will be the

21   attorney for the defendant, National Union Fire Insurance

22   Company of Pittsburgh.  And let me go ahead and announce the

23   case.  *Crowley Maritime Corporation versus National Union Fire*

24   *Insurance Company of Pittsburgh*, Case No. 3:16-cv-1011.

25           And let me see if I can get all the cast here.

1    Mr. Shugrue.

2             Am I saying it right?

3             MR. SHUGRUE:  Yes, Your Honor.

4             THE COURT:  Ms. Garrison.

5             MS. GARRISON:  Yes, Your Honor.

6             THE COURT:  Mr. Lembcke, how are you, sir?

7             MR. LEMBCKE:  Good.  How are you?

8             THE COURT:  And assisted by Ms. Lehmann.

9             And is it Fi-con or Fic-on?

10            MR. FICON:  Fi-con.

11            THE COURT:  Ficon, vice president on the Crowley

12   side.

13            And then over here on -- Mr. Duffy and Mr. Bloom for

14   National Union; is that correct?

15            MR. DUFFY:  Yes, Your Honor.

16            THE COURT:  Okay.  Good.

17            All right.  What confused me slightly is usually I

18   have the plaintiff -- y'all are on the opposite sides of what

19   I'm normally used to, so that's -- that was why I was

20   struggling with who was who.  But I think I got it now.

21            So, Mr. Duffy, are you going to present the argument

22   on behalf of National Union?

23            MR. DUFFY:  Yes, I am, Your Honor.

24            THE COURT:  You may proceed.

25            MR. DUFFY:  Good morning, Your Honor.

1          Michael Duffy from Peabody & Arnold on behalf of the

2    defendant, National Union Fire Insurance Company of Pittsburgh,

3    Pennsylvania.  And with me is Jason Bloom from Lydecker Diaz.

4          Your Honor, as a brief, I guess, statement of the

5    case, for the benefit of our listeners, this is an insurance

6    coverage dispute.  It involves the plaintiff's attempt to

7    recover legal fees which it paid on behalf of one of its

8    employees during the period from 2008 through 2013.

9          The underlying circumstances involve a -- an

10   antitrust conspiracy between Crowley and a number of other

11   shipping companies, in which they were setting prices for

12   shipping in the -- between Jacksonville and San Juan primarily.

13   We know that that's true because Crowley pleaded guilty to

14   criminal charges in 2012.

15         The motion today is a motion for summary judgment

16   that was originally filed as a motion to dismiss.  And it's

17   based primarily -- or not primarily, but at least initially, on

18   the fact that we had a prior arbitration in this case.

19         The underlying facts involve a search warrant served

20   at Crowley's offices in 2008, which was submitted to National

21   Union at that time for coverage under the policy.

22         There was a denial of coverage in 2008.  Crowley then

23   filed a demand for arbitration in 2012 seeking to recover fees

24   that it paid on behalf of four of its employees starting in

25   2008.

1    The arbitration panel issued an award in January of

2 2013 in favor of National Union, finding that National Union

3 did not owe a duty to pay any of those fees under the policy.

4    In 2013, after the arbitration award, Mr. Farmer was

5 indicted.  And at that point National Union did agree to

6 recognize the proceeding against Mr. Farmer.  Actually, it was

7 a month before the indictment.

8    But we agreed to treat that as a claim against

9 Mr. Farmer.  And we recognized fees incurred from 2013 forward

10 as potentially covering -- as covered under the policy.

11    National Union, in fact, paid Mr. Farmer's fees from

12 2013 through 2015.  In 2015, he was acquitted by a jury.  And

13 in 2015, Crowley went back and obtained from the court a copy

14 of the original search warrant affidavit that was filed in

15 2008.

16    And based on that affidavit, they filed this action,

17 claiming that, based on the affidavit, National Union now is

18 retroactively obligated to pay attorneys' fees incurred from

19 2008 through 2013, even though the arbitration panel decided in

20 2013 that National Union was not obligated to pay any of those

21 fees.

22    That's basically what it's about in a nutshell.

23    THE COURT:  And let me just -- and I appreciate that.

24 And let me just say one other thing, and then we'll -- we'll

25 get going here.

1       The operative portion of the policy -- there may be

2   other portions that are relevant.  But the one that people talk

3   about the most in this case is that the policy provides

4   coverage for an insured if there is a civil, criminal,

5   administrative, or regulatory investigation of an insured

6   person.  In this case that's going to be Mr. Farmer, as you'll

7   hear.

8       And here's the key language:  Once such insured

9   person is identified in writing by such investigating authority

10  as a person against whom a proceeding described in definition

11  may be commenced.

12      And so you'll hear probably a lot about that as we go

13  along, but -- and the primary arguments, as you'll start to

14  hear, are res judicata based on the arbitration award and,

15  alternatively, that the statute of limitations has expired on

16  the claim.

17      So, Mr. Duffy, you may now proceed with your

18  argument.

19      MR. DUFFY:  Thank you, Your Honor.

20      Your Honor, as you know, we initially filed this as a

21  motion to dismiss.  It was converted by the court into a motion

22  for summary judgment.

23      We conducted discovery for a period of months.  I

24  don't remember the exact -- how many.  We took multiple

25  depositions.  And now we're back before you as a motion for

1  summary judgment.

2        Our view is that nothing which happened in the course

3  of discovery points to any disputed issue of fact.  Our motion

4  is based on the chronology of events.  And the chronology of

5  events is not disputed, I don't believe, in any respect by

6  Crowley.

7        The base of chronology I alluded to earlier is that

8  we have this conspiracy running up to 2008.  We have a policy

9  issued by National Union, November 1st of 2007.  And there are

10  a couple of provisions of the policy that are pertinent.

11        There's the definition of claim, as Your Honor

12  mentioned earlier, but there's also Endorsement 14 to the

13  policy, which is designated as a run-off endorsement.

14        What that policy says is that the insured was granted

15  a six-year discovery period in which it could report to

16  National Union claims that were first made against an insured

17  during the discovery period.

18        THE COURT:  And I had a question about that as it --

19  as it interrelates with the statute of limitations.  Is the --

20  what is the interrelationship between the statute of

21  limitations and the run-off period?

22        In other words, let's say you have -- you know,

23  Florida -- I guess it was five years.  It ended up being almost

24  coextensive, I guess, but -- and what if you had a state who

25  had a three-year statute of limitation on breach of contract

1  claims, but you have the six-year run-off period?

2       Does the policy, in effect, allow claims beyond where

3  a statute of limitations might otherwise?  I just -- I just was

4  not familiar -- I've done a lot -- a fair amount of insurance

5  coverage work.  I just am not familiar with this run-off period

6  and how it works.

7       MR. DUFFY:  Well, Your Honor, I don't think there's

8  actually any case law on that question, because it just never

9  comes up.

10       And the reason why it never comes up is this.  If you

11  have a later-filed claim which relates back under section 7(c)

12  of the policy --

13       THE COURT:  Right.

14       MR. DUFFY:  -- under the *Office Depot* case, there's

15  no coverage -- even suing relation back, there's no coverage

16  for fees incurred prior to the date the actual claim was made.

17  So relation back wouldn't matter, I think.

18       As far as how it interrelates to the statute of

19  limitations, you know -- I don't think it changes the statute

20  of limitations.  Florida law still says you have a five-year

21  period in which you're allowed to file suit.

22       The six-year run-off period and the statute of

23  limitations have different starting points.  The six-year

24  run-off period starts when the policy is issued.  And you have

25  six years to report a claim.

1    The five-year statute of limitations starts on the

2    date of the breach, which I think is the date of the denial.

3    So the two periods measure different things for different

4    purposes.

5    THE COURT:  Well, they do.  But you could envision a

6    situation where the run-off period was longer than the statute

7    of limitations period.  But I know that's not necessarily what

8    we're talking about.

9    I just didn't -- I just was not -- it was just kind

10   of an interesting thing to me as I was reading it, because -- I

11   guess really the question I had is:  Is the -- does the policy

12   treat relation back the same way that a statute of limitations

13   would?

14   MR. DUFFY:  Let me just make one more point about the

15   run-off endorsement.

16   THE COURT:  Yeah.

17   MR. DUFFY:  Because you have six years to report a

18   claim.

19   THE COURT:  Right.

20   MR. DUFFY:  And then you have five years to file a

21   suit for when the claim is denied.  So you could report a claim

22   in year number six.  If it's denied at that point, then you'd

23   have five more years to file suit.  If you report a claim in

24   year number one and it's denied, then you'd have five years to

25   file suit.  So they just measure different things.

1         The run-off period is when the claim has to be

2 reported.  And as long as it's timely reported, you have five

3 years from the date of breach in order to file the suit.

4         THE COURT:  All right.  Well, we probably could write

5 a law review article on it, but we're not going to.

6         MR. DUFFY:  Okay.

7         THE COURT:  So let's -- can I just ask you a

8 question?

9         MR. DUFFY:  Of course.

10         THE COURT:  So what happened in this case is that the

11 search warrant was issued and Mr. Farmer was named in the

12 search warrant.  He also received a grand jury subpoena.

13         And we now know -- and those were thought by the

14 arbitrators to be insufficient information to meet the policy

15 provisions.

16         We now know that at that same time that the search

17 warrant was issued, this affidavit was actually part of it,

18 which it always is, but that affidavit was kept under seal by

19 the court, which is not unusual in a criminal investigation.

20         In that affidavit Mr. Farmer was specifically named

21 as a subject of the investigation.  So I have two questions for

22 you.

23         First of all, I want to understand your position.  If

24 that affidavit had been available at the same time as the

25 search warrant, so that -- and so that the record included the

1   affidavit as part of the information available, would that have

2   been sufficient under the policy to identify in writing the

3   insured person by such investigating authority as the person

4   against whom a proceeding may be commenced?

5           MR. DUFFY:  Your Honor, our position on that would be

6   no.  But our position on that is that -- we're not relying on

7   that as the basis for our motion.

8           THE COURT:  I understand.  But it -- it is important

9   to me.  Because I want to know are we talking about -- are we

10  talking about something that if it had been known at the time

11  it was actually executed, like the search warrant was, would

12  National Union have denied coverage saying that even that

13  writing was not good enough?

14          Or are we talking about a situation where National

15  Union acknowledges that buried in the backyard, under seal of

16  the court, same thing, that -- that under the seal of the court

17  there was, in fact, a writing which identified the insured

18  person as being investigated?

19          MR. DUFFY:  Well, no, Your Honor, we don't

20  acknowledge that.  And -- but as I said, that's not the grounds

21  for our motion.

22          THE COURT:  Why don't you acknowledge it?  What do

23  you --

24          MR. DUFFY:  Because our view on that would be that

25  there's a difference between being a subject of an

1  investigation and being a target of an investigation.  And

2  those are terms of art with the Department of Justice.  And the

3  affidavit lists a whole -- 20 people as subjects.

4  THE COURT:  Right.

5  MR. DUFFY:  And to be a subject --

6  THE COURT:  Well, but some of them happen to be your

7  insured, right?

8  MR. DUFFY:  Some of them were and some of them

9  weren't.  And there were four or five of our insureds named.

10  But to be a subject is different than being a target.

11  To be a subject just means that the government is

12  going to look at you.  It says nothing about who is going to be

13  indicted or who might be indicted.

14  THE COURT:  And so why -- if that's true, why isn't

15  that your position in this case?  Why are you relying on

16  res judicata?

17  I mean, in other words, why didn't you just come in

18  and say, It doesn't matter; it doesn't matter about this

19  affidavit; we wouldn't have given you coverage even if we had

20  known about it?

21  Why wouldn't you -- why isn't -- why wasn't that one

22  of the positions that were -- that was asserted by you?

23  MR. DUFFY:  Maybe could have been.  But when we filed

24  the motion, it was a motion to dismiss.

25  THE COURT:  And I converted it to a motion for

 1   summary judgment.  And I did so -- I don't really remember --

 2   because it's been a while.  But I felt like we were trying to

 3   rely on too much outside of the four corners of the complaint.

 4         Now, I have to say, when I read that y'all took a

 5   bunch of depositions and there's experts in the case and all

 6   that, I didn't necessarily think that was going to happen.  I

 7   didn't -- right now, if you had to ask me, I wouldn't know what

 8   either one of these experts said that had anything to do with

 9   anything.

10         I mean, in other words, I don't -- I don't -- y'all

11   don't really rely on it in your briefing and they don't really

12   rely on it too much in theirs.  And it just seemed like a

13   couple of other people -- Bill Jones, who I have great respect

14   for, and this other fellow who I don't know -- but it just

15   seemed like they were just telling me what they thought.  And I

16   think I probably have to decide that.

17         So I -- when I converted it to a motion for summary

18   judgment, I did so because -- I think because we were going to

19   be relying on arbitration.  We were going to -- y'all were --

20   it seemed to me that we were trying to rely on things that were

21   outside of the four corners of the complaint and that I would

22   be in a little bit of peril to try to decide this case just

23   on -- on the motion to dismiss.  So I converted it.

24         Then y'all turned it into this big thing with

25   depositions and experts and everything and -- okay.  That's

1   fine.  And now we're kind of back to where we started from.

2        And -- but I guess I -- I guess my question is -- so

3   you don't really care whether the affidavit was out there or

4   not, because you wouldn't -- you wouldn't have paid the claim

5   anyway.

6        MR. DUFFY:  Well, Your Honor, that's kind of a

7   hypothetical question, what they would have done, and it never

8   actually came up.

9        The reason why the argument is not in the initial

10  motion is because it was a motion to dismiss.  And we were

11  concerned about going too far outside the pleadings, that the

12  only document that we referred to in the motion was the

13  arbitration award, which is quoted in the complaint.

14       So we thought we could do that and still do it as a

15  motion to dismiss.  When it was converted to a motion for

16  summary judgment, I guess we could have injected that

17  additional argument into the case.  We didn't --

18       THE COURT:  Well, I guess what it -- I guess by not

19  doing that, what it made me think was that you were

20  acknowledging that if that affidavit had been available at --

21  on a more timely basis, that that would have been a writing

22  that identified the insured person under the provisions of the

23  agreement.

24       And so that -- and I agree with you it doesn't --

25  it -- you could argue it doesn't make any difference to your

1   res judicata or statute of limitations argument.

2          But you could also argue it does if -- because when I

3   read this provision, it says that a claim is defined as a

4   civil, criminal, administrative, or regulatory investigation of

5   an insured person once such person is identified in writing by

6   the investigating authority as a person against whom a

7   proceeding may be commenced.

8          What I said to myself was:  Well, even though it

9   wasn't publicly available, there is such a writing.  There is

10  such a writing.  There's an affidavit that says he's the

11  subject of an investigation.

12         So why is that not -- why is that not important?

13         MR. DUFFY:  I'm not saying it's unimportant.  I mean,

14  it was not in the original motion, because it was a motion to

15  dismiss.

16         We haven't argued it here, because I guess we were

17  concerned that -- how to characterize the affidavit would be

18  seen as a question of fact.  And we were trying to focus on

19  things that were strictly issues of law in the context of a

20  motion for summary judgment.

21         So for purposes of this motion --

22         THE COURT:  But you're telling me that what would

23  have happened if -- if National Union had received this

24  affidavit in the same 2008 time period, it would have written

25  back to Crowley and said, Sorry, still no coverage -- or no

```
 1   coverage, because you're not the target of the -- Mr. Farmer is
 2   not the target of the investigation, he's only the subject of
 3   the investigation, and, therefore, he has not been identified
 4   in writing by such investigating authority as a person against
 5   whom a proceeding may be commenced?
 6           That's what -- that's what you're telling me National
 7   Union's position would have been?
 8           MR. DUFFY:  Well, as I said, of course, the question
 9   never arose.  But if it did arise, I think our position then
10   would be what it is today, which is there's a difference
11   between being the subject and being a target of an
12   investigation.
13           THE COURT:  Okay.
14           MR. DUFFY:  But our motion states on things which are
15   straight questions of law, which is that -- the res judicata
16   and the statute of limitations.
17           I want to make one more point, though, because I
18   think we're merging two separate issues.  One is the definition
19   of a claim.  And the other is when a claim is deemed to have
20   been made against an individual insured.
21           And our view is that you can't say that a claim has
22   been made against an individual unless he's aware of it.
23   Because under a claims made policy, the question of when a
24   claim is made is what governs when the insured is required to
25   report it.
```

1       THE COURT:  You don't think Mr. Farmer knew he was

2   the subject of a criminal investigation?

3       MR. DUFFY:  I don't think he knew that -- I don't

4   think he knew what the affidavit said.

5       THE COURT:  Well, I know he didn't know what the

6   affidavit said.  But you don't think he knew that he was the

7   subject of a criminal investigation?  You want to get him under

8   oath and ask him?

9       MR. DUFFY:  He may have reasonably believed that,

10  Your Honor.  But that's not the test for coverage.  The test

11  for coverage is you have to be identified in writing.

12      Now, everything --

13      THE COURT:  So you're saying that even though --

14  you're saying even assuming that the affidavit satisfied the

15  writing requirement, because Mr. Farmer didn't know what the

16  affidavit said, he's not able to make a claim -- a claim has

17  not been made against him, and, therefore, he's not able to put

18  you on notice?

19      MR. DUFFY:  Yes.  In fact, that was really the issue

20  at the arbitration.  Because at the arbitration Crowley was

21  arguing that, Well, we have a search warrant; therefore, we

22  must have an affidavit.  And we think that the affidavit

23  probably identifies these four people, but nobody knew.

24      And what the arbitration panel decided is that those

25  circumstances are not sufficient to constitute the claim having

1    been reported to National Union on the policy.

2              In order to have the reporting of a --

3              THE COURT:  So you're saying that the affidavit --

4    the fact of the affidavit's existence and its potential

5    significance was discussed during the arbitration?

6              MR. DUFFY:  Yes.

7              THE COURT:  And I -- I agree with you it was.  I only

8    had, like, little bits and pieces of the arbitration.  I'm

9    not -- y'all didn't give me the full transcript.  But I did see

10   it was certainly discussed.  I was interested in what the final

11   decision said, though.

12             It says, The affidavit has remained sealed.

13             This is the arbitrator's decision.

14             Therefore, its specific allegations have never been

15   made known to Crowley or its employees.  And this is the part

16   that I am going to need some help with.

17             However, as testified to at the arbitration hearing,

18   its essence can be inferred from the substance of the search

19   warrant.

20             I don't know what that means.  What's the -- what

21   inference is being drawn, that it identified him, that it

22   didn't identify him?  I didn't understand what that meant.

23             MR. DUFFY:  Well, you know, Your Honor, I didn't

24   write it.  But this is from the panel.  And it's not clear to

25   me exactly what the panel meant by that.

1       But it -- but assume they inferred that, Okay.  It

2  probably talks about the following people.  That's not the same

3  thing as knowing that it talks about the following people.

4  That's not the same thing as knowing that any individual has

5  been identified in writing.

6       If you know that there is an affidavit, you can take

7  an educated guess about what it looks like, just based on what

8  the -- they were looking for when they searched Crowley's

9  offices.  But that's not what the policy requires.

10      What the panel found is that in order for there to be

11 coverage there has to be evidence that he was identified in

12 writing and that -- and that National Union was aware of that,

13 that it was -- the existence of a claim was reported to

14 National Union.

15      And what the panel found is that as of January of

16 2013 no claim under the policy had been reported to National

17 Union, and, therefore, National Union did not have to cover the

18 fees incurred between 2008 and 2013.

19      THE COURT:  So then -- and then, like, two weeks

20 later, in February, I guess Mr. Farmer was given a plea

21 agreement by the government.  So I guess at that point he

22 certainly knew he was --

23      MR. DUFFY:  We did not have long to celebrate our

24 victory.

25      THE COURT:  And so you felt like -- that the plea

1    agreement was enough evidence in writing that he was under

2    investigation, and that's when you started to cover the claim?

3           MR. DUFFY:  Not just -- not evidence that he's under

4    investigation, but evidence that he's a person who is probably

5    going to be charged at that point.  He can either plead -- and

6    the clear implication of the letter is that, If you don't take

7    the deal, we're going to indict you, which is, in fact, what

8    happened within a couple of weeks of the date of the plea

9    agreement.

10          THE COURT:  And then you covered him for two years

11   through his acquittal?

12          MR. DUFFY:  Correct.  Correct.

13          Our view was that when we received these materials,

14   in the spring of 2013, that -- that satisfied all the

15   requirements in the policy.  He was identified in writing.  He

16   received writing and he gave the writing to us.

17          And at that point it was coverage treated under the

18   policy and we paid a significant amount of money to his defense

19   counsel in the two years between 2013 and 2015.

20          What we're talking about now is an attempt to

21   retroactively create coverage for the fees in the first five

22   years that we didn't have to cover at the time of the -- the

23   time of the arbitration.

24          THE COURT:  At the end of the arbitration decision,

25   in the conclusion, the arbitrators wrote -- also, it was

1   interesting -- it said the majority of the panel.  It kind of

2   led me to believe it was like a two-to-one decision, but they

3   don't -- I guess arbitrations don't record dissent.

4          It says, The materials Crowley submitted to National

5   Union did not constitute a claim for insured persons as the

6   term claim is defined in the policy.  The triggering event

7   specified in the policy has not yet been presented to National

8   Union.

9          And are you saying that in February that triggering

10  event occurred, February 13?

11         MR. DUFFY:  Yes.

12         THE COURT:  All right.  But that the uncovering of

13  the affidavit was not a triggering event?

14         MR. DUFFY:  The uncovering of the affidavit two years

15  later, in 2015, was not a triggering event, because it wasn't

16  given to us until 2015, which is after the discovery period.

17  It's after the case is over.  And at that point we're talking

18  about fees that would go back seven years, all the way to 2008.

19         THE COURT:  By the way, you know, everybody always

20  talks about how arbitration is supposed to be this inexpensive,

21  brief, you know, way to get right to it.

22         I'm looking here at the fees and I'm thinking you

23  get -- you file a lawsuit and it costs you 350 bucks, and you

24  get a judge and a jury and everything.  And you file an

25  arbitration and you get -- you pay all this money.  But I guess

1    everybody still likes it.

2              So -- by the way, that actually did raise a point

3    with me.  Why is this suit not in arbitration?  Why are we

4    here?

5              MR. DUFFY:  Well, maybe we should be.  But the

6    parties -- they filed it in court.

7              THE COURT:  Right.  And you didn't ask for -- you

8    didn't move --

9              MR. DUFFY:  No, we didn't ask for arbitration.

10             THE COURT:  You didn't ask for arbitration.  So here

11   we are.

12             MR. DUFFY:  Right.

13             THE COURT:  So, in other words, you waived -- and

14   that's fine.  But you waived the -- because I looked at the

15   policy.

16             I mean, obviously the first time the parties had a

17   dispute under this policy, they went to arbitration, because

18   that's what the -- that's what the policy says.

19             And so I'm reading the policy and I'm looking at

20   this -- the contention that the arbitration is res judicata and

21   all that.  And I'm thinking, Well, why didn't they just go back

22   to arbitration?

23             I've never -- I don't think I've ever been asked to

24   find an arbitration res judicata of subsequently filed federal

25   suit.  It appears that there's some law that says that you -- I

1   wasn't even sure that res judicata applied.

2           I didn't know -- because I've never been asked before

3   to apply an arbitration -- a private arbitration award as

4   res judicata of a federal lawsuit.

5           Have you ever -- have you ever had to do that before?

6           MR. DUFFY:  I've never done that before, but, Your

7   Honor, as we say in our brief, there is quite a bit of case law

8   which says that arbitration awards are given the same

9   res judicata effects as judgments.

10          THE COURT:  Wouldn't you -- wouldn't you -- couldn't

11  you have gone back to the same panel or filed for arbitration

12  and said -- and said -- had the panel rule that it was

13  res judicata?

14          MR. DUFFY:  Well, there is no proceeding -- the

15  procedure in arbitration, to go back to the same panel.

16          THE COURT:  There's not?

17          MR. DUFFY:  Once the panel is discharged, you have --

18  I think it's 60 days for any post-decision proceedings.  And

19  then after that, the panel cannot be brought back together.

20          So there could have been --

21          THE COURT:  Another weakness.  But I digress.

22          MR. DUFFY:  Yes.  There could have been a whole new

23  arbitration with a different panel.  Crowley chose to file the

24  suit here and we chose to let it stay here.

25          THE COURT:  Well, that's fine.  I'm happy to have

1    y'all.  I just -- it seemed kind of unusual.  I don't think

2    I've ever been asked to apply res judicata principles to a

3    private arbitration before.

4           MR. DUFFY:  And, Your Honor, if you -- Your Honor is

5    asking about the reasons.  It's, I think, mainly because of the

6    appellate rights that you have in a court that you don't have

7    in an arbitration.  And if you lose in an arbitration on a

8    point of law, that's the end of it.

9           THE COURT:  Yeah.

10          MR. DUFFY:  If you lose in a court on a point of law,

11    you do have further proceedings available to you, so...

12          THE COURT:  You're making my point.  But everybody

13    loves arbitration, apparently, except the people that lose.

14          MR. DUFFY:  It's not always quicker or faster, Your

15    Honor.  You're right.

16          THE COURT:  Well, I've actually had arbitrations

17    where the Federal Rules of Civil Procedure applied.  I mean, it

18    was everything exactly like the lawsuit was.  People took

19    depositions and had experts and all this stuff.  And the only

20    difference was they had to pay the arbitrators a bunch of

21    money, and -- and you have absolutely no right of review.

22          MR. DUFFY:  And the taxpayers are paying you.

23          THE COURT:  So I get the same no matter what.

24          But, anyway, that's not really the point either.  The

25    only point that I wanted to ask you about is there's -- there's

1    no -- and your opponents haven't really raised this.

2            But there's no doubt in your mind that

3    res judicata -- the same res judicata principles that apply if

4    this had been another lawsuit that had been adjudicated to

5    verdict -- they apply in this case, even though this was a

6    private arbitration award?

7            MR. DUFFY:  Your Honor, there's no doubt in my mind

8    on that.  And we cite a whole -- a long string cite of cases in

9    our first memo.  And there's not been any disagreement from

10   Crowley on that.

11           THE COURT:  The other question I had for you -- and,

12   again, these are just things as I was going through.

13           The arbitration panel applied Delaware law.

14           MR. DUFFY:  Yes, it did.

15           THE COURT:  And nobody is citing me Delaware law.

16   Why not?

17           MR. DUFFY:  Well, that's an interesting question.

18   Because we had a lot of discussion at the arbitration about the

19   choice of law.

20           And the alternative dispute resolution clause in the

21   policy which provides for either mediation or arbitration says

22   that in the event of an arbitration, the panel shall -- I don't

23   have the exact wording in front of me -- shall give due

24   consideration to the law of the jurisdiction in which the

25   plaintiff is incorporated, I think something like that, and it

1    doesn't say what due consideration means.

2              It doesn't say Delaware law shall apply.  It says the

3    court's -- the panel shall give due consideration to Delaware

4    law.

5              We had a long talk about that with the panel.  They

6    eventually decided the case under Delaware law.  I don't think

7    there were any substantive differences, so I don't think that

8    it matters.

9              THE COURT:  Well, I don't know anything about

10   Delaware res judicata law.  But, I mean, the parties seem to be

11   relying on Florida or federal principles.

12             It's not quite --

13             MR. DUFFY:  Well, I think that's right.  That's

14   because the provision in the policy, which the panel thought

15   incorporated Delaware law, is only in the ADR clause.  And that

16   doesn't apply here, because we're not acting under the ADR

17   provision of the policy.

18             So we have the usual law that we have a contract

19   issued to an insured in Florida.  And the usual rules of

20   Florida law would govern that kind of contract.  So that's been

21   our position here.  And I think it's been the position of both

22   parties.

23             THE COURT:  So let me -- because I'm going to need to

24   give your opponent some time here.

25             So the principle of res judicata that -- because

1    res judicata is an equitable doctrine.  And so it's supposed to

2    not only be legal, but it's supposed to be fair.

3            And is the principle of res judicata violated when

4    there is evidence under lock and key that nobody -- none of the

5    parties can get to, and then after the arbitrators rule that

6    evidence becomes available, and it would have been important to

7    have at that time -- why isn't -- why should I apply

8    res judicata in that kind of an unusual situation?

9            MR. DUFFY:  Well, I guess, first of all, because we

10   meet all of the criteria set out under Florida law to have

11   res judicata.

12           And as far as the equity of it -- you know, Crowley

13   says that, Well, we're only asking National Union to do what

14   they should have done at the beginning.

15           But they're not.  We only had to cover fees at the

16   beginning if a claim was made against the insured and timely

17   reported to us.

18           And if that had happened, everything would have been

19   different, because we would have been involved in the selection

20   and the supervision of defense counsel.

21           None of that happened.  The thing went on on its own

22   for five years.  And they were doing this completely on their

23   own.

24           National Union had denied coverage.  The panel said

25   that National Union had correctly denied coverage.

1          So now we're trying to retroactively, seven years

2    later, in 2015, create coverage for fees that weren't covered

3    at the time.

4          That's not what the policy is meant to cover.  This

5    is -- it's a strange argument.  I've never seen it before.

6    That's not what the policy is about.

7          THE COURT:  All right.  Let me ask you one other

8    question.  And then I'm going to have to give your opponents

9    some time here.

10         So there appeared to be two cases that -- that are --

11   that come out to opposite results.  And I just want you to give

12   me a -- just if you have a way to do it.

13         The cases I'm talking about are the *Trustmark* case

14   from the Eleventh Circuit which I think you all like, and the

15   *Badra* case from the Fourth District in Florida that I think

16   the -- your opponents like.

17         Are those cases -- and they both deal with things

18   that occur -- information that comes to light after the

19   proceeding has concluded.

20         Is there a way to reconcile -- is there a rule or a

21   point of law that can reconcile those two decisions?  I know

22   they were different on their facts, but -- or are they just

23   different on their facts?  Or what do you say about that?

24         MR. DUFFY:  I think that -- -- it's not quite right

25   to say that they involve information which comes to light after

1     the decision.  They involve new facts which occur after the

2     decision.

3            So I'm not sure if I have the right case, but there

4     was one Florida case on res judicata where the landlord filed a

5     notice of eviction and he lost, and then he filed a corrected

6     notice of eviction after the arbitration, and that was not

7     res judicata because that was a new notice and a new claim.

8            There is a difference between new events which occur

9     after the decision and discovery of events which existed before

10    the decision.  So they're not about information that comes to

11    light.  They're about new things that happen.

12           THE COURT:  And so you don't -- you don't think that

13    the fact that this affidavit which contained relevant

14    information -- the fact that it was unavailable to anybody

15    doesn't make it the functional equivalent of new information?

16           MR. DUFFY:  It does not make it new events.  And I

17    think the point there is also -- it's also known that in

18    Florida there is no discovery rule on breach of contract

19    actions.

20           And the courts in Florida and up through the Eleventh

21    Circuit say very clearly that there is -- the cause of action

22    for breach of contract accrues at the date of the breach even

23    if the insured -- even if -- even if the plaintiff is unaware

24    of it at the time, even if the insured doesn't know about it on

25    the --

1          THE COURT:  So you're saying that the law

2  contemplates that there can be information which might be

3  valuable, but for whatever reason doesn't come to light, and

4  sometimes that's just too bad?

5          MR. DUFFY:  I think that's right.  And I think that's

6  what -- that's the result of the fact that there is no

7  discovery rule under contract.

8          On a tort case you would have a discovery rule.  But

9  on a contract case in Florida, you do not.  And the courts have

10  said very clearly that it doesn't matter for purposes of

11  determining when the cause of action accrues whether the

12  plaintiff even is aware of the fact that he has a claim.  That

13  does not matter under Florida law.

14          THE COURT:  All right.  Thank you, sir.  I'm sure

15  I'll give you a chance to talk.  I know you didn't get to say

16  everything --

17          MR. DUFFY:  I had a whole lot of other things I

18  wanted to say.

19          THE COURT:  I know you did.  I'll probably give you

20  some time.  I'll tell you what I'll do, go -- because I asked

21  you a bunch of questions.

22          I'll just give you a few minutes to just say whatever

23  you want to say and I'll be quiet, and then I'll -- and then

24  I'll talk to your opponent.

25          MR. DUFFY:  Okay.  I will do this in a very condensed

1   fashion.

2          THE COURT:  Sure.

3          MR. DUFFY:  We've already talked --

4          THE COURT:  And let me just say to you, this is why I

5   do this.  I can listen to canned presentations all day long,

6   but I got that in the briefs.

7          MR. DUFFY:  Right.

8          THE COURT:  So this is me -- this is me working it

9   out in my head while I'm asking you questions and getting help

10  from you.

11         So don't feel like because you don't get to say

12  everything you want to say that that means it hadn't been

13  worthwhile, so...

14         MR. DUFFY:  And, Your Honor, this is the -- I don't

15  remember the last time I had a motion where two parties filed

16  seven briefs.  So everything is really in the papers.

17         THE COURT:  Yeah.

18         MR. DUFFY:  So all of it --

19         THE COURT:  Yeah.

20         MR. DUFFY:  -- I think is there.

21         THE COURT:  Go ahead.

22         MR. DUFFY:  We basically have three arguments for

23  summary judgment.  The first we've touched on is the

24  res judicata argument.

25         And I think it is clear that the arbitration award

1   gets the same res judicata effect as a court decision.  The

2   res judicata standard requires four identities.  You have to

3   have the same parties, the same things sued for, the same cause

4   of action, and the same person who is the defendant.

5           All of those are undisputed except, to some extent,

6   the same cause of action.  But on the cause of action issue,

7   the Florida case -- and we cite these in our papers, so I'm

8   repeating it, really, I guess.

9           They followed the transaction test.  And they say

10  that claims arising out of the same transaction are

11  res judicata.  Claims are res judicata if the evidence

12  necessary is the same in the two cases.

13          Now, here, this case and the arbitration both are

14  about breach of contract claims for breach of the same contract

15  for the same fees.

16          In this case and in the arbitration, what they had to

17  prove was exactly the same, that there was a contract, that a

18  claim was made, that it was timely reported, and that National

19  Union failed to pay.

20          So the evidence necessary -- it's not just similar,

21  it is exactly the same.  And we don't -- there's no -- nothing

22  has happened since the arbitration which changes that.

23          On the statute of limitations, we have a five-year

24  statute of limitations in Florida for breach of contract.  We

25  have no discovery rule.

1          THE COURT:  Let me ask you this -- and I know I said

2     I'd be quiet.  But this is my key question on the statute of

3     limitations.

4          Is this just a catch-22?  In other words, if they had

5     waited for this affidavit to become available and then tried to

6     get relief, not -- not gone to arbitration in 2012, waited for

7     the affidavit, the day after the affidavit becomes available,

8     then they file their suit, you'd be saying statute of

9     limitations, wouldn't you?

10          MR. DUFFY:  If -- probably if it was more than five

11     years, but -- yeah.  I think you have five years to file suit

12     no matter when you discover the claim.

13          THE COURT:  So it's a little bit of a catch-22, in

14     the sense that if you're saying -- if you're saying that the

15     affidavit is -- is there, but not available to them, then it

16     becomes -- and so you shouldn't have gone and arbitrated -- if

17     you really cared about the affidavit, you shouldn't have gone

18     and arbitrated without it.  Now you have it.  Now it's too late

19     because it's res judicata.

20          But if you'd waited for the affidavit, it would have

21     also been too late because of the statute of limitations, so

22     you are just out of luck.

23          MR. DUFFY:  Well, if they waited more than five

24     years, and they --

25          THE COURT:  Well, I mean, isn't it true that the

1    affidavit only became available after five years?

2              MR. DUFFY:  Well, it became available to the public.

3    I mean, Mr. Farmer got a copy in the spring of 2013.  He did

4    not have permission from the court to share it beyond his

5    defense team, but he -- he could have asked the court for

6    permission to share it with whoever was paying his legal fees,

7    and he didn't.  So we'll never know what would have happened to

8    that motion, because it was never filed.

9              THE COURT:  All right.

10             MR. DUFFY:  I also wanted to -- wanted to address

11   just for a minute the third argument we're making about the

12   compliance with the discovery period in the policy.

13             Six years, from July 1st -- June 1st -- sorry,

14   November 1st, of 2007, the claims were made and reported to

15   National Union.

16             We have to look separately at two different

17   questions:  When was the claim made and when was the claim

18   reported?

19             Crowley's position on the papers is, I think, that

20   the claim was made against Mr. Farmer on April 16th of 2008,

21   even though he didn't know it at the time.

22             Now, we don't think that's right.  Because we don't

23   think it's possible for a claim to be made if you don't know

24   about it, because that would cause all kinds of problems for

25   insurance about when they have to report things.

1    But if we assume it to be true, as Crowley says, that
2    the claim was made on April 16th, then the question is:  When
3    was that claim reported to National Union?  And it wasn't
4    reported until 2015, when they told National Union, Here is the
5    affidavit, this is what it says.

6    Prior to that it was just, This is what we think it
7    says, but we don't really know.  So a claim reported in 2015 on
8    its face is outside the discovery period.

9    They have said, Well, we reported it in 2008 because
10   that's when we gave the search warrant, but that's the argument
11   they made at the arbitration.  And it didn't work.

12   You cannot just say, We told you in 2008 there was a
13   search warrant and, therefore, there was an affidavit, but we
14   didn't know what it said.  That was the -- that is the issue
15   that's already been decided against them by the panel.

16   We have a claim here -- if they're right, it was made
17   on the date of the affidavit, reported to us in '15, and it's
18   untimely.

19   You know, Your Honor, it's as if they're saying, If
20   someone at the DOJ writes down on a yellow legal pad, I think
21   Tom Farmer should be indicted, and they put it in the drawer of
22   their desk and they never tell anybody -- a claim can't be made
23   as of that date because he doesn't tell anybody.  Because when
24   a claim is made it has to be reported.

25   They also argue that, Well, we have relation back

1    under section 7(c) of the policy.  Because when the search

2    warrant was submitted, it was treated by National Union -- not

3    as a claim, but as a notice of circumstances.

4            And section 7(c) says that any claim made

5    subsequently or after those circumstances will be treated as if

6    it was made on the date of the notice.

7            That provision can have no application to a claim

8    that was made before the notice of circumstances.  It only

9    applies to claims made after.

10           So if Crowley is right that the claim was made on

11   April 16th, 7(c) of the policy is of no potential

12   applicability.

13           If, on the other hand, the claim is deemed to have

14   been made against Mr. Crowley -- against Mr. Farmer, when he

15   got the affidavit in 2013, that it might relate back to notice

16   of circumstances -- in fact, it would.

17           But the *Office Depot* case in the Eleventh Circuit is

18   directly on point in that case and that situation.  That also

19   involved National Union.  It involved the same policy forum

20   that we're dealing with here.

21           And what the Eleventh Circuit said is that when you

22   have a notice of circumstances and a claim made subsequently,

23   it does relate back, but there is no coverage under the policy

24   for the fees incurred prior to the date of the actual claim.

25           And by the time Mr. Farmer got the affidavit, we were

1    already paying his legal fees anyway.  So relation back

2    wouldn't help in that situation.

3         THE COURT:  All right.  I'm going to have to stop you

4    right --

5         MR. DUFFY:  Thank you, Your Honor.  I'll rest on the

6    papers.  Thank you.

7         THE COURT:  Appreciate it.

8         MR. SHUGRUE:  Good morning, Your Honor.

9         THE COURT:  Good morning.

10        MR. SHUGRUE:  John Shugrue for Reed Smith on behalf

11   of the plaintiff, Crowley.

12        I'd like to start with the run-off endorsement,

13   because I think there are some critical mischaracterizations

14   and misstatements made by National Union with respect to that

15   provision, and also mischaracterizations of the facts.

16        What National Union now seems to be arguing, which

17   was never actually the basis for their motion, and which they

18   have not actually moved for summary judgment on, but they

19   brought it into the mix here, is taking the position that the

20   DOJ investigation -- which is the claim that is at issue here.

21        The claim is the DOJ investigation of Mr. Farmer,

22   that that was not reported to National Union until the

23   affidavit that supported the issuance of the search warrant was

24   made available to National Union until 2015.  But that

25   factually and legally is not correct.

1        In 2008, Crowley was served with a search warrant.

2   Crowley reported to National Union through its broker, Aon, a

3   claim.  It reported that a claim had been made against Crowley

4   and its individual insureds.

5        That is the language that was used in the notice that

6   Aon provided to National Union in April of 2008.  It was noted

7   and reported and submitted as a claim.

8        Accompanying the Aon letter was an e-mail from

9   Mr. Ficon, who is with us in court today, that attached the

10  search warrant.

11       The search warrant on its face reflected that the

12  search warrant was obtained based on an affidavit filed by an

13  FBI special agent which provided the basis for finding probable

14  cause for issuance of the search warrant.

15       So the affidavit was facially identified on the claim

16  documents that were submitted and reported and noticed by

17  Crowley to National Union in 2008.

18       And Mr. Ficon, in his e-mail that was part of that

19  notice, specifically stated the charges, i.e., the allegations,

20  the accusations, that give rise to this search warrant are

21  contained in these materials that are filed under seal.

22       And critically, National Union, in its May 2008

23  denial letter, specifically stated that what Crowley had

24  provided, and what they understood Crowley had provided, was

25  notice of a claim as that term is defined under the policy.

1          And Mr. Reed -- Mr. Farmer's defense counsel followed

2    up in later correspondence, in June of 2008, and reiterated

3    that what was being noticed and reported and pursued from

4    National Union was coverage for a claim as defined in the

5    policy, a claim being -- arriving -- a DOJ investigation, as to

6    which a writing has been made to identify Mr. Farmer.

7          THE COURT:  But that's what you went to arbitration

8    on and lost.

9          MR. SHUGRUE:  No.  That's not true, Your Honor.  The

10   issue in the arbitration was whether Crowley had been able to

11   establish the existence of the claim.

12         And it was clear that the affidavit was a critical

13   part of that, that the affidavit was sealed, it was unavailable

14   to the parties, it was unavailable to Crowley, had not been

15   made available for purposes of the arbitration, so that the

16   panel ruling in -- the arbitration decision was not that

17   Crowley had notified National Union of a claim in 2008 or

18   reported the DOJ investigation as a claim in 2008.

19         In fact, the panel award in several places

20   specifically indicates that Crowley filed its first notice of

21   client notifying National Union.

22         THE COURT:  And so tell me why -- why is this

23   significant to what we're doing here?  I'm not sure I'm

24   understanding what --

25         MR. SHUGRUE:  It's significant because National Union

1  now takes the position that this run-off endorsement applies.

2  And the run-off endorsement says that Crowley has only six

3  years until November of 2013 to report or notify National Union

4  of a claim.

5          And National Union is now taking the position that --

6  notwithstanding all these communications and the reporting that

7  went back and forth between Crowley and National Union in 2008

8  and 2009, that Crowley never reported or notified National

9  Union of a claim during that time period.

10         THE COURT:  Well, what is -- what is what happened in

11  2015 when you-all got this affidavit and you sent it to

12  National Union?  What were you doing then?

13         MR. SHUGRUE:  We were providing the document, the

14  affidavit, that had previously been available, although well

15  known to everyone, National Union, Crowley and the arbitration

16  panel, and Mr. Farmer and his counsel -- providing the

17  documentation to establish that what Crowley asserted in 2008,

18  in fact, was correct, that as of April 2008 a claim --

19         THE COURT:  But -- but in the meantime --

20         MR. SHUGRUE:  -- was as to Farmer.

21         THE COURT:  But in the meantime, you'd had a complete

22  arbitration that went all over this evidence and you got ruled

23  against.  And so that can't just be an irrelevancy.

24         MR. SHUGRUE:  It's not an irrelevancy.  But what the

25  panel did not rule on, and National Union urged the panel not

1   to make a ruling by speculating or drawing inferences about the

2   contents of the search warrant affidavit -- and he mentioned

3   the panel making the statement that, Well, certain inferences

4   can be drawn.

5           National Union, however, argued to the panel, But you

6   can't do that.  We have to have the affidavit itself.  And

7   without the affidavit itself, Panel, you cannot draw inferences

8   or speculate about the contents of the affidavit.

9           So the panel, at National Union's expressed urging,

10  limited its ruling to whether the documents that were available

11  and had been presented by Crowley to National Union qualified

12  as a client.

13          THE COURT:  And how do I know that?  I mean, all I

14  have -- I mean, maybe I -- I tried to read what I had, but I

15  don't have -- I've got little snippets of the arbitration that

16  I think y'all provided.

17          But I don't have -- what you just said to me as a

18  fact, that Crowley specifically -- I mean, that National Union

19  specifically told the arbitrators not to consider the

20  affidavit, not to -- I mean, I have little snippets of

21  conversation from the arbitrators about what the significance

22  of the affidavit is.  There was some argument in there, maybe

23  by you, if I recall correctly.

24          And -- but, you know, I don't -- if you're trying

25  to -- if you're trying to tell me that somehow the -- the

1    meaning of the affidavit was excluded from the arbitrator's

2    decision, it's not entirely clear to me that that's true.

3           I mean, everybody knew that it was there, and

4    everybody was trying to talk about what it meant and what it

5    didn't mean, and whether it would identify them or it wouldn't

6    identify them, but obviously nobody really knew.

7           So if this was so important -- I guess I'm having a

8    little trouble understanding why this affidavit is so important

9    now but wasn't important enough for somebody to go ask the

10   court to unseal it, or for something to happen, or for the

11   arbitration to be held in abatement to go see if we could get

12   it -- I mean, if everybody really thought this was such an

13   important thing, why didn't things like that happen?

14          MR. SHUGRUE:  Okay.  Well, let me start, Your

15   Honor -- first, the panel did expressly, in its conclusion, in

16   its opinion, limit its ruling to the materials that Crowley

17   submitted to National Union, held that the materials Crowley

18   submitted to National Union, which did not include the

19   affidavit, because it was unavailable, did not constitute a

20   claim for insured persons as the term claim is defined in the

21   policy.

22          That's where the panel then says the triggering event

23   specified has not yet been presented to National Union.  I

24   think -- the panel doesn't say specifically the affidavit may

25   be the triggering event.

1       But I think if you look at the entirety of the award

2   and the arguments that were made, that's what the panel was

3   considering.

4       And National Union argued specifically to the

5   panel -- and this is in the materials, which say you could

6   hypothesize various writings which might qualify as a claim.

7   That's irrelevant.  The issue is whether these specific --

8       THE COURT:  That's a little fast -- that's a little

9   fast to read.  Thank you.

10      MR. SHUGRUE:  Sorry.

11      National Union's counsel argued to the panel, You

12  could hypothesize various writings which might qualify as a

13  claim.  That's irrelevant.  The issue is whether these specific

14  documents that were submitted to National Union in 2008

15  qualified.

16      And one of the arbitrators noted the regrettable

17  thing is that the affidavit is under seal.  If that thing were

18  not under seal, we would be having a very interesting

19  discussion about what it shows or doesn't show.

20      And this ties into the principles of res judicata,

21  which are that if there are different facts and conditions that

22  intervene between the prior action and the subsequent action,

23  then res judicata does not apply.

24      THE COURT:  But everybody -- this is different than

25  that.  Everybody knew that there was this affidavit and it just

1  wasn't available, although it doesn't look like anybody tried

2  to get it, and -- let me back you up.

3        Let's say -- let's say that instead of an arbitration

4  that you had filed this suit in this court and we had gone to

5  trial and a jury had ruled that based on the information

6  available to National Union that -- that no claim had been

7  made, and during the course of the trial this affidavit was

8  referenced and, Yeah, we don't know what it says, and we can't

9  get it, and so forth, and a jury had ruled.  And let's even say

10  it was affirmed on appeal.

11        Would you be able to come back into this court and

12  file another lawsuit once this affidavit came due in 2015?

13        MR. SHUGRUE:  I would say yes, because of the -- the

14  principles that applied to res judicata, for several reasons.

15        First, what happened in the arbitration was more akin

16  to a declaratory judgment ruling than a decision that would be

17  rendered by a jury.

18        The panel interpreted the insurance policy as a

19  matter of law and decided that the definition of claim was not

20  satisfied based on the materials, as to which there was no

21  dispute, Crowley had submitted to National Union.

22        And it is true, and we agree, that principles of

23  res judicata that apply to legal decisions in court applied

24  equally to arbitration decisions.

25        And one of those principles, which we've cited in our

1   materials, is that res judicata does not apply in a declaratory

2   judgment situation.

3          So it's not at all unusual for an insured, as Crowley

4   did in this case, to say, We've submitted certain materials to

5   the insured -- to the insured that we believe trigger coverage,

6   and we'd like a declaration as a matter of law that those do

7   trigger coverage.

8          Here, the panel's ruling -- when you look at what it

9   says in conclusion, the materials submitted to date, which is

10  what National Union urged the panel to limit its ruling to and

11  limit its focus on, do not satisfy the definition of claim,

12  don't substantiate that a claim was made.  The material -- the

13  triggering event has not yet been presented to National Union.

14         Well, when the affidavit was finally unsealed and

15  made available to Crowley in 2015, and was submitted to

16  National Union, at that point the evidence that established

17  that a claim had been made against Mr. Farmer in 2008 was now

18  in front of National Union.

19         In terms of what could Crowley have done or why

20  didn't they try to unseal these materials earlier, as Your

21  Honor stated earlier, it's not at all unusual for a search

22  warrant affidavit to be sealed.

23         Here, there were three separate orders, two by the

24  court in the Middle District of Florida, one by the district

25  court in Puerto Rico, that put strict limitations on the

 1 | ability of parties to whom the affidavit actually was provided.
 2 |        THE COURT:  So did y'all -- you obviously made a
 3 | strategic decision.  You knew you didn't have the affidavit.
 4 | And you didn't know what it said either.  You had a -- I mean,
 5 | you might have guessed, right?  But you didn't really know, did
 6 | you?
 7 |        MR. SHUGRUE:  Well, we didn't have the affidavit.
 8 | And so no one knew exactly what it said.
 9 |        THE COURT:  Sure.  So you made a strategic -- Crowley
10 | made a strategic decision to go in front of this arbitration
11 | panel, knowing it didn't have the affidavit, knowing it was not
12 | going to have it, and to make its case to the arbitration
13 | panel, and you lost.
14 |        And a couple of years later the affidavit becomes
15 | available and you say, Gosh, I wish we would have had this when
16 | we were in front of that arbitration panel.
17 |        And then you get to file a new federal lawsuit and
18 | say, Never mind what happened before, this is it now?
19 |        MR. SHUGRUE:  Yes.  Because, Your Honor, the facts
20 | and conditions that were present, and the facts that were
21 | determined by the panel in the arbitration, and as to which it
22 | adjudicated the parties' rights and obligations -- the panel
23 | did not have before it the affidavit, so was not able to
24 | determine are there facts --
25 |        THE COURT:  But it knew it didn't have it.  And you

1   knew it didn't have it.

2           MR. SHUGRUE:  Correct.  Correct.

3           THE COURT:  And it's not like this is something

4   that -- this isn't a classic piece of newly discovered evidence

5   or anything.

6           This is actually something that everybody knew was

7   there and knew it was under seal, and it was -- it was kind of

8   baked into the arbitration, wasn't it?  I mean, you-all are all

9   talking freely about this affidavit and what it might say and

10  what it might not say.

11          And so were you thinking at that point:  Well, if we

12  win the arbitration, good for us; if we lose the arbitration,

13  well, we'll get the affidavit later, and then we'll -- then

14  we'll get to try again?

15          Is that -- was that the calculus?

16          MR. SHUGRUE:  Well, no, Your Honor.  At that point in

17  time it wasn't clear whether we would ever get the affidavit.

18  I mean, it was entirely possible -- maybe not likely, but

19  possible, that Mr. Farmer wouldn't be indicted.

20          If Mr. Farmer had never been indicted, then the

21  search warrant might have remained under seal.  There would

22  have been no opportunity or ability or reason to have it

23  unsealed.

24          So Crowley made the decision that having reimbursed

25  Mr. Farmer for several million dollars of legal fees, having

1   uncertainty about whether the affidavit would become available

2   or when it would become available, that it would attempt to

3   establish coverage based on materials that it had.

4           The panel, obviously, indicated that the materials

5   that were presented -- if you look at all of the National Union

6   correspondence, it's very clear there is a denial of coverage

7   in every instance --

8           THE COURT:  Let me ask you this.

9           MR. SHUGRUE:  -- based on the materials submitted.

10          THE COURT:  This may be -- this may be a fanciful

11  question, but let me ask it anyway.

12          Let's say the exact opposite thing occurred; that is,

13  that you went to arbitration and, based on the papers that you

14  put in front of the arbitrators, they found there, in fact, was

15  coverage.

16          2015 comes and the affidavit is unsealed and it says,

17  Mr. Farmer is not the subject of the investigation, and he

18  never was.  We just wanted to get records from him.  We don't

19  care about him.

20          Would Crowley then be able to file an action in court

21  to recover all these legal expenses that they paid you over

22  this time?

23          MR. SHUGRUE:  With National Union?

24          THE COURT:  National Union.  Sorry.

25          MR. SHUGRUE:  Yes, they actually would, because

1   there's a specific -- specific provision in their policy that

2   says that if we advance defense costs and it is later

3   established that the claim for which we advanced the costs was

4   not actually covered, then we have a right of recoupment.

5          THE COURT:  So you would have said, All right.  Yeah,

6   you're right, here's your money.

7          MR. SHUGRUE:  Well, if -- if the affidavit, in fact,

8   indicated that Mr. Farmer was not someone against whom a

9   criminal proceeding might be commenced, then that would have

10  been the outcome.  I think Your Honor hit the nail on the

11  head -- there I go with bad analogies of --

12         THE COURT:  I never heard that one before.

13         MR. SHUGRUE:  But you --

14         THE COURT:  Did you just make that up?

15         MR. SHUGRUE:  But the catch-22 point that you made --

16  so Crowley could have waited, not brought the arbitration.  But

17  by the time it got the affidavit, and even by the time

18  Mr. Farmer got the affidavit, which he couldn't share with

19  Crowley, per the court's order -- I mean, he only actually

20  obtained the affidavit by entering into this protective order

21  that indicated he couldn't share outside the defense team --

22  but if Crowley had made it, we would have been faced with this

23  catch-22.

24         Well, now you've got the affidavit.  You didn't

25  pursue the arbitration.  You waited to get the affidavit.  Now

1    you have it.  Well, you lose because of the statute of

2    limitations.

3              THE COURT:  Well, let me ask you this:  What would

4    have happened if the affidavit had not come unsealed until the

5    year 2030?

6              Would you be able to -- in 2030, would Crowley be

7    able to file a suit against National Union and say, Hey,

8    remember that thing we had 20 years ago, you owe us -- you owe

9    us a bunch of money?

10             MR. SHUGRUE:  Well, I think --

11             THE COURT:  I mean, I guess I don't -- I don't -- I

12   mean, there has to be some -- I mean, the reason we have

13   statute of limitations is not necessarily because people don't

14   have valid claims after they expire.

15             It's just that there's some finality that needs to

16   occur in our legal system.  Otherwise, people will always be at

17   risk.

18             And so if my -- if you want to tell me that my

19   2030 -- well, I don't know about 2030, but I do know about

20   2015, you've got -- you're going to have to explain to me what

21   the -- what the difference is.

22             MR. SHUGRUE:  Well, I think if you -- if you strictly

23   applied the legal principles for statute of limitations, there

24   may not be a bar on your hypothetical.

25             Now, there would be a bar based on other timing

1   issues that we've identified as removing statute of limitations

2   from play in this case that the -- would not be available in

3   that circumstance.

4           For example, we have the principles of law that --

5   when you have defense coverage from an insured, that the

6   statute of limitations does not start running until the

7   underlying matter is resolved, finalized, which did not occur

8   in this case until Mr. Farmer's acquittal in 2015.

9           So under that principle, the statute of limitations

10  for National Union's defense obligation, duty to pay the costs

11  of defending this DOJ investigation, which included the

12  pre-indictment phase, the indictment, the trial, that statute

13  of limitations doesn't even start running until 2015, when

14  Mr. Farmer is acquitted.  We also have the principle of a

15  continuing breach.

16          Now, in this case there were legal fees and invoices

17  submitted to National Union up to December 2012 prior to the

18  arbitration that they failed and refused to pay.

19          That would be a continuing breach.  And the statute

20  of limitations would run five years from December of 2012.  So

21  it still would not have run out.

22          Now, National Union's rejoinder to that is to say,

23  Well, there really was no breach, because the panel said you

24  hadn't given us information to prove your assertion that there

25  was a client, so it couldn't be a continuing breach if there

1  was no breach.  But what Mr. Duffy argued earlier is that the

2  trigger isn't the breach.  It's the denial.

3          So if National Union's denial of coverage in 2008, on

4  the basis that the materials submitted did not prove the

5  existence of a claim -- if that started the statute of

6  limitations running, according to National Union's theory, that

7  each time National Union was provided with invoices or tendered

8  to them for payment, provided to them for payment, and they

9  failed or refused to pay, that would be a continuing denial or

10  a continuing breach, if you will, that would refresh and extend

11  the statute of limitations from that point forward.

12          So those sorts of temporal restrictions on the

13  application of the statute of limitations would not be

14  available in your hypothetical that the affidavit wasn't

15  obtained until 2013.  So there are protections that would

16  apply.

17          THE COURT:  2030, not --

18          MR. SHUGRUE:  2030.  Sorry.

19          THE COURT:  So what is the arbitration decision

20  res judicata of?

21          MR. SHUGRUE:  Whether the search warrant, the grand

22  jury subpoena -- there were a couple of other documents that

23  had been provided by Crowley to National Union.  It's

24  res judicata that those documents do not substantiate the

25  existence of a claim against Mr. Farmer.

1   THE COURT:  Why isn't this just like any other case

2 that, Gosh, I sure wish I had had that piece of evidence before

3 I went to trial?

4   I mean, this is -- this is not a new claim or a

5 new -- this is just -- isn't this just evidence of -- of the

6 claim?

7   MR. SHUGRUE:  Well, I would say it's both.

8   First, it -- and it's unusual.  And it's not just,

9 Oh, I wish we would have had that evidence.  Because this

10 wasn't just something that Crowley could have found out, could

11 have had access to, could have known about, but just didn't,

12 because of bad, you know, lawyering or failure to obtain the

13 information.

14   This is a situation where because of the sealing of

15 the affidavit Crowley was not able to obtain access to it until

16 it was ultimately unsealed.

17   Now, remember -- you know, Mr. Duffy talked about the

18 fact that, you know, Crowley entered into a plea agreement.

19 And Crowley was involved in this antitrust criminal

20 investigation and litigation.

21   So, you know, the hypothesis that a court -- first of

22 all, there's no evidence presented by National Union that there

23 was any possibility or probability or likelihood that this

24 affidavit could have been unsealed and made available to

25 Crowley or to National Union anytime prior to 2015.

1        We presented the opinion testimony of Mr. Jung to the

2   contrary, that it would not have been made available, because

3   the investigation was still ongoing.

4        And the *Bennett* case that National Union cites

5   reflects that the compelling government interest in protecting

6   an ongoing investigation overcomes the right of access to

7   obtaining the search warrant affidavit.  And we certainly have

8   seen no case, and National Union has certainly seen no case --

9        THE COURT:  Where was the -- where was the

10  investigation at the point in time that Crowley initiated the

11  arbitration?  Had Crowley pled by that point?

12       MR. SHUGRUE:  No.  No, Your Honor.

13       THE COURT:  When did Crowley plead?

14       MR. SHUGRUE:  That was in -- I believe it was in the

15  summer of 2012, so after the arbitration was initiated and

16  prior to the hearing and the arbitration.

17       THE COURT:  And so you're saying, in effect, that the

18  burden of not knowing what's in this affidavit falls on

19  Crowley -- I mean, on National Union, not on you?

20       In other words, you didn't try to get it.  And I

21  understand why -- there may be really good reasons not to --

22  not to be poking at the Department of Justice and trying to

23  get -- I mean, I can understand that as a strategic matter.

24       But the fact remains you didn't even try to get it.

25  Whether you would have gotten it or not, I agree with Mr. Jung

1    it's probably more likely than not that you wouldn't have,

2    although I guess Mr. Farmer had it, and his lawyer, but...

3          So you don't have to try to get it.  You don't have

4    to be told no.  But the fact that it isn't there then becomes

5    Crowley's problem when it's unsealed two years later, or eight

6    years later, or whenever it was, eight -- I guess it was in

7    2008 to 2015, so seven years later.

8          So why is that Crowley's problem and not your

9    problem?

10         MR. SHUGRUE:  Why is it National Union's problem?

11         THE COURT:  I can't -- I'm sorry.  Y'all -- I tell

12    you, you messed me up.  You sat on the wrong side.  And I

13    cannot get over it.

14         All right.  Why is that -- why is that National

15    Union's problem and not Crowley's problem?

16         MR. SHUGRUE:  Well, again, Your Honor, I would say

17    this.  National Union had protection under the policy if it had

18    decided to advance the defense costs subject to a reservation

19    of rights.

20         They could have said, We're going to advance your

21    defense costs, advance Mr. Farmer's defense costs, but subject

22    to a reservation that if the affidavit is obtained and it

23    reflects that Mr. Farmer was not a target or a subject, or was

24    not identified as someone against whom a criminal proceeding

25    may commence, then we have the right to recoup those defense

1    costs.

2              They had the right in the event that Mr. Farmer was

3    convicted of criminal conduct.  They had the right under the

4    policy to seek to recoup those defense costs.

5              So National Union has built within the policy

6    protections of its interest with respect to, you know -- maybe

7    incorrectly -- advancing defense costs or advancing defense

8    costs for something that ultimately proves not to be covered.

9              You know, Crowley doesn't have any sort of, you know,

10   protection other than when the document -- the critical

11   document that everyone knew existed, but could not be

12   obtained -- no other protection than to submit the document at

13   that time and to say, As we contended, as we believed, as we

14   urged, we felt, and Mr. Farmer's counsel has felt all along,

15   and certainly believed and acted in accordance with that

16   belief, that this was a claim, that Mr. Farmer was certainly in

17   the cross-hairs of this DOJ investigation.

18             THE COURT:  I read a letter from Mr. Farmer's counsel

19   to somebody confirming that he was the subject of an

20   investigation.  I can't remember who the letter went to or when

21   it was.

22             Does that letter have anything to do with this, or

23   not?

24             MR. SHUGRUE:  Well, I know that Mr. Farmer's counsel

25   sent correspondence to National Union that indicated that he

1   had been told, or that he believed there was some writing that

2   identified Mr. Farmer.

3          Now, ultimately, we've never seen confirmation of

4   that, or we've never seen the writing that he alluded to in

5   that correspondence.

6          So the only writing that -- or writings that -- of

7   which we are aware are the plea offer that was made to

8   Mr. Farmer in 2013, and, of course, the affidavit, which --

9   and, again, we -- we have included in -- within our papers, in

10  the expert reports of Mr. Jung and Mr. Sagalow, some of the

11  excerpts from the affidavit.  We also have the affidavit in its

12  entirety.

13         THE COURT:  How is this any different -- how is this

14  any different -- I'm just trying to think about this and then

15  we're going to start to wrap up here.

16         How is this any different than if a critical witness

17  in the case died before the trial?  And you wanted to say, Boy,

18  if we had that witness, we really would be -- we really would

19  be able to -- and the other side says, Well, we don't really

20  know what that witness would have said, and now we're never

21  going to know, and so the fact finder just has to make their

22  determination on the best evidence available, it's not perfect,

23  but our system isn't perfect, and they reaped the result, and

24  that is entitled to finality in our system, we're just not --

25  we're just not good enough to be perfect, and that if we start

1    to go back and open up decisions that have been made on the

2    best available information, because of -- of things that

3    happened that we knew had happened at the time we were making

4    the decision -- that that's not what our system is set up to

5    do, what -- what principle of law am I validating by agreeing

6    with your view of this -- of the res judicata issues?

7              MR. SHUGRUE:  Well, here, Your Honor, the new facts

8    and conditions that intervene following the arbitration were

9    the judicial unsealing of the affidavit and that affidavit

10   becoming available to Crowley, Crowley tendering that affidavit

11   to National Union as proof that a claim, in fact, had been made

12   against Mr. Farmer in 2008, and asking for coverage followed by

13   National Union's denial.

14             So you have new circumstances and conditions that

15   have intervened.  You have new conduct that's intervened.  And

16   you have facts that were not part of the record in the

17   arbitration that are now available to be adjudicated.

18             Now, in your example, the -- it's not a situation

19   where the witness had given testimony -- recorded testimony and

20   everyone knew that the testimony was there, but it was filed

21   under seal and inaccessible to the parties.

22             Now, that's more a situation where the evidence isn't

23   available just because it wasn't -- you know, it couldn't have

24   been obtained by -- or it wasn't sought by the parties in the

25   litigation.

1          Now, here, we have these external issues of the

2    sealing orders that prevented Crowley from accessing the

3    affidavit and prevented the panel from considering the

4    affidavit.

5          And, again, when you look at -- I mean, if you look

6    at the record of the arbitration -- and we have provided

7    segments, excerpts of it, not the entire transcript, not the

8    entire record.

9          But it's very clear that when National Union issued

10   its denials of coverage, it said, This is based on what you've

11   given us.  If you -- if there's anything else that you think we

12   should consider, please provide that to us.

13         And one of Mr. Duffy's partners at Peabody & Arnold

14   even said, Provide that information to us at any time.

15         And when the arbitration occurred, National Union's

16   argument and position was, You, Panel, are constrained by the

17   *Office Depot* case from drawing inferences about the affidavit

18   without having the affidavit itself in front of you.

19         And they urged the panel not to draw inferences about

20   the affidavit, not to speculate about the contents of the

21   affidavit, not to hypothesize about what the affidavit

22   contained.

23         And the panel, therefore, issued a ruling that was

24   narrow, and, again, akin to a declaratory judgment ruling,

25   ruling that, On the evidence presented by Crowley to National

1   Union, we find that Crowley has not proven that a claim was

2   made against Mr. Farmer, but that information that -- you know,

3   has not yet been presented.

4        I think the "not yet been presented" is critical to

5   understanding the panel's order.  It certainly seemed to leave

6   open that that triggering event could become available and

7   could be provided subsequent to --

8        THE COURT:  Well, in fact, there was a triggering

9   event that occurred just weeks later.  And they did start to

10  pick up coverage.

11       So that could also be read to say that if a -- if a

12  claim is made, or notice of a claim is given, and it has proper

13  support, that -- that it should be paid, which is what

14  happened.  So I'm not sure how to read that, but I hear what

15  you're saying.

16       Let me ask you two quick questions, and then I'm

17  going to have to get you to --

18       MR. SHUGRUE:  Yes, Your Honor.

19       THE COURT:  Tell me why the *Trustmark* case doesn't

20  hurt you.

21       MR. SHUGRUE:  Well, Your Honor, the -- we, of course,

22  look to the *State Street Bank* case as being --

23       THE COURT:  The *Badra* case?

24       MR. SHUGRUE:  Right.

25       THE COURT:  Right.

1      MR. SHUGRUE:  -- as being the case that more properly

2  fits our circumstance, and that you have these subsequent

3  notices, separate notices, that are given after the initial

4  proceeding.

5      That's not unlike -- and I think it's analogous to

6  our case, where we have a subsequent tender of the affidavit as

7  additional evidence supporting the claim that was first

8  reported and submitted in 2008.

9      And that's based on information that became

10  subsequently available, those changed facts and circumstances,

11  those different conditions.

12      So we view the case as falling within the *State*

13  *Street Bank* provisions and holding, as opposed to the *Trustmark*

14  case.

15      And if you look at the -- the general principles that

16  were stated by the *Eleventh Circuit in the Southeast Florida*

17  *Cable versus Martin City* case -- or *Martin County* case, you

18  know, the -- those principles, we think, apply here too.

19      You have to look at the factual issues to be resolved

20  in the second cause of action and compare them with the issues

21  explored in the first cause of action.

22      And here, again, the factual issue as to the contents

23  of the affidavit and the import and implication of those

24  contents, for purposes of establishing that Mr. Farmer was a

25  potential target of a criminal proceeding, those facts were not

1    resolved in the first case.

2         THE COURT:  All right.  The second question I have

3    for you is:  Where are we in this case if I deny summary

4    judgment?

5         I understand if I grant it then the insurance company

6    wins and you lose, subject to appeal, of course.  But if I deny

7    it, where are we?  What's -- you did not cross-move.

8         MR. SHUGRUE:  Correct.

9         THE COURT:  So there's no cross-motion for summary

10   judgment.  I've now denied summary judgment.  What am I going

11   to try?

12        MR. SHUGRUE:  Well, we have completed all discovery.

13   So trial would be the next step.

14        THE COURT:  Right.

15        MR. SHUGRUE:  I think there are issues that would be

16   presented to the court for resolution.  And to the extent there

17   are policy interpretation issues -- such as, for example:  Does

18   the affidavit set forth facts and information that indicate

19   that Mr. Farmer was someone against whom a criminal proceeding

20   may be commenced, I think that would probably be a legal matter

21   for the court to resolve as a matter of interpreting the policy

22   as against those undisputed facts of the contents of the

23   affidavit.

24        There may be fact issues that would need to be

25   presented, possibly, to a jury on the reasonableness of the

1    defense costs that were incurred on Mr. Farmer's behalf, that

2    Crowley reimbursed or paid on Mr. Farmer's behalf.  But --

3            THE COURT:  What are those numbers that -- what are

4    the rough numbers of the fees that you'd be seeking in this

5    case?

6            And what are the rough numbers for the fees that were

7    paid by Crowley after the February 2013 plea agreement was

8    tendered?

9            MR. SHUGRUE:  The fees that we're seeking for the

10   fees prior to Mr. Farmer's indictment are, I believe,

11   approximately 2.5 million.  That's plus or minus, ballpark.

12           THE COURT:  Okay.

13           MR. SHUGRUE:  The fees that National Union paid for

14   Mr. Farmer's defense once he was indicted and through trial, I

15   don't know precisely what those numbers are off the top of my

16   head, but I believe they were in the -- perhaps in the

17   two-million-dollar range.  Mr. Duffy may have a better handle

18   on what those numbers were.

19           THE COURT:  Mr. Duffy, what's the approximate amount

20   there?

21           MR. DUFFY:  Your Honor, I don't know exactly.  I

22   think it's about two million dollars, but I could be wrong.

23           THE COURT:  Okay.

24           MR. DUFFY:  Approximately.

25           THE COURT:  Okay.  And, obviously, since he was

1    acquitted, that was the end of that, right?  So there wasn't an

2    appeal or anything?

3            MR. SHUGRUE:  Correct, correct.  And those fees that

4    were paid by National Union post-indictment are not something

5    that's being sought.  Obviously, those were paid.  So that's

6    not part of the damages claim.

7            THE COURT:  And is the reason that this claim isn't

8    on behalf of Crowley, as well as the others -- is that because

9    they were -- ended up being criminally implicated?

10           Is that why we're only talking about Mr. Farmer?

11           MR. SHUGRUE:  No.  We're talking about Mr. Farmer

12   because -- our view was that the affidavit most clearly

13   established that Mr. Farmer was someone against whom a criminal

14   proceeding may be commenced.

15           THE COURT:  Okay.  All right.  Thank you, sir.

16           MR. SHUGRUE:  Thank you, Your Honor.

17           THE COURT:  Just stay right there a second,

18   Mr. Duffy.

19       (Judge confers with intern.)

20           THE COURT:  Just give me a second here.  I made some

21   notes before we started.  I just wanted to make sure I've

22   covered what I -- obviously, this is -- we could talk about

23   this, I'm sure, for a long time.

24       (Judge confers with law clerk.)

25           THE COURT:  Mr. Shugrue, I have one question for you

1   on the statute of limitations.  The -- as I understand it,

2   you're making some type of continuing breach argument

3   or argument that because litigation was ongoing about this

4   matter even up until 2015 that the statute of limitations

5   didn't start -- what's the legal basis for that?

6          And I guess the question is:  Weren't the damages

7   established as of 2013, when they -- when National Union

8   started picking up the coverage?  And so didn't you know

9   what -- I guess I'm just not understanding the basis of that

10  argument.

11         MR. SHUGRUE:  Your Honor, there are two separate and

12  independent arguments on the statute of limitations --

13         THE COURT:  Right.

14         MR. SHUGRUE:  -- in connection with what you just

15  asked.  The first argument is that when you have a policy that

16  provides for coverage of defense costs --

17         THE COURT:  Right.

18         MR. SHUGRUE:  And here we had a duty to advance

19  defense costs, which Florida courts have said is the equivalent

20  of a duty to defend.

21         THE COURT:  Right.

22         MR. SHUGRUE:  But when you have a duty to defend or a

23  defense coverage policy, the time for the statute of

24  limitations to begin running, that does not start until the

25  conclusion of the underlying matter.

1    So, now, in this case it is true that National Union

2  commenced paying Mr. Farmer's legal fees post-indictment, but

3  there were fees that they didn't pay during that process.

4    There might have been issues about whether they were

5  entitled to any sort of a claw-back or reimbursement of legal

6  fees.

7    So until that matter was finally concluded with

8  Mr. Farmer's acquittal, the Florida law says that the statute

9  of limitations on defense coverage under a policy does not

10 begin to run.  So that's one basis for avoiding the statute of

11 limitations argument, or defeating it.

12    The second basis is the continuing breach argument,

13 which is that, here -- again, if you accept National Union's

14 position that there was a breach or a refusal to pay or denial

15 of coverage in May of 2008 that started the limitations period

16 running, again, Florida law -- and we've cited these -- these

17 cases -- the *Grissom* case in particular -- on the final

18 adjudication point.

19    If you have additional denials or refusals to pay

20 periodically, subsequent to the initial denial, that that

21 triggers a fresh -- the running of the statute of limitations.

22    So, here, after the initial --

23    THE COURT:  Well, but I'm looking at a case called

24 *Dinerstein* from the Eleventh Circuit.  It says, The Florida

25 Supreme Court has directly addressed this issue and held that a

1  breach of contract action on an insurance contract accrues on

2  the date the contract is breached.

3        Does that -- does that take away from your argument

4  or --

5        MR. SHUGRUE:  No.  That's when -- that's when the

6  statute of limitations would accrue, would be the date of the

7  breach.

8        THE COURT:  Right.

9        MR. SHUGRUE:  But the case law that we've cited on

10  the continuing breach point reflects that if subsequent to that

11  initial breach or denial there are subsequent additional

12  refusals to pay, denials in response to specific requests for

13  demands of payments, tenders of defense invoices, that the

14  statute of limitations refreshes again.

15        So after the initial denial in May of 2008, Crowley

16  and Mr. Farmer's lawyers periodically sent invoices to National

17  Union that National Union failed and refused to pay, all the

18  way up through a final submission prior to the arbitration of

19  December of 2012.

20        THE COURT:  Thank you.

21        Mr. Duffy, I -- I think you've addressed this, but I

22  just want you to give me a minute on it.

23        You wrote in your briefs that coverage is triggered

24  once the insured was identified in writing as being under

25  investigation.

1          And I recognize you're going to debate me whether

2     it's subject or target or whatever, but let's put that to the

3     side.

4          So isn't it, in fact, true that this person was

5     identified -- Mr. Farmer was identified in writing, it was just

6     buried under the -- in the backyard?  And so wasn't coverage

7     triggered?

8               MR. DUFFY:  No.

9               THE COURT:  Why?

10              MR. DUFFY:  Well, I guess, first of all, because I

11    would question the distinction between a subject and a target,

12    but put that to one side for the moment.

13              We're talking, as I said, about two different issues.

14    There's the definition of a claim and when a claim can be said

15    to have been made against an individual.

16              And a claim, in our view, cannot be said to have been

17    made against an individual until the individual is aware of it.

18    And Mr. Farmer may have known or believed that he was the

19    subject of an investigation, but he didn't know what that

20    affidavit said until he got a copy.  And he did not know that

21    until 2013.

22              So the claim -- even if we assume that what they say

23    about the affidavit is right, that was not a claim made against

24    Mr. Farmer until he knew that it was true.  And that didn't

25    happen until 2013, at the earliest.

1    THE COURT:  All right.  I'll give you two minutes or

2  so of rebuttal time if you want to pick out a point or two that

3  you really wanted to -- since you're the moving party, I

4  usually give you the last word, but it's just going to be very

5  brief.

6    MR. DUFFY:  Yeah, Your Honor.  And we do generally

7  rest on the papers, because everything is covered there.  I

8  want to just respond to two different cases.

9    One is the *State Street versus Badra* case.  And the

10  facts there are very different than in this case.  In that case

11  you had a lender that filed a notice of foreclosure.  The court

12  in the first case found that the notice was defective.

13    After the case was over, the lender gave a new notice

14  of foreclosure.  And the court found, on the second page, that

15  the new notice was not defective.

16    So that case is not about the discovery of facts

17  which existed before the first trial.  It's about a whole new

18  claim based on all new facts, which did not exist at the time

19  of the first trial.  So it's really very different.

20    And the second point I wanted to mention is on the

21  *Grissom* case, about the breach of the duty to defend.  When you

22  have a policy with a duty to defend -- and, by the way, this

23  policy is not a duty to defend; it's a reimbursement policy.

24    But when you have a duty to defend, if you breach the

25  duty to defend, if you wrongfully refuse to pay, the court does

1    say that the insured doesn't have to sue until the case is

2    over.   But that is only if the insurer breaches the policy by

3    wrongfully failing to defend.

4          In this case we've already litigated that.   We know

5    that, based on the arbitration panel, there was no duty to pay

6    anything as far as 2013.

7          And just to correct Mr. Shugrue on one point, we're

8    not saying that there was a breach of policy in 2008.   I'm --

9    asking somebody when there was a breach of policy is like

10   asking you:   When did you stop beating your wife?

11         Because their answer is, There was no breach as far

12   as we're concerned.   We're not saying we breached the policy in

13   2008.   We're saying that that's what their claim is, at least

14   as we understand it, and, therefore, a suit more than five

15   years later is time-barred.

16         Thank you.

17         THE COURT:   Thank you.

18         MR. SHUGRUE:   Your Honor -- I'm sorry -- may I have

19   30 seconds on one point?

20         THE COURT:   Yes, sir.   Yes, sir.

21         MR. SHUGRUE:   The statement that Mr. Duffy just made

22   about a claim can't be made until the insured is aware of it,

23   Mr. Farmer was aware of the claim.

24         He was aware that he was the target of an

25   investigation.   He hired a lawyer to pay millions of dollars

1    for defense counsel.  And, of course, he ultimately was

2    indicted and tried on criminal antitrust conspiracy charges.

3            And the policy --

4            THE COURT:  So what he's really saying is until he

5    was aware of the affidavit, and you're saying that's not really

6    what the point is?

7            MR. SHUGRUE:  Correct, and for two reasons.  One is

8    that, of course, he was aware of the affidavit and aware that

9    the affidavit contained allegations that supported a showing of

10   probable cause for the search warrant.

11           But, secondly -- and, again, we've argued this in our

12   brief -- this policy does not require receipt of that document

13   from the investigating authority.

14           There are other policy provisions that say it's only

15   a claim that's been served, when it's received, and a companion

16   policy that National Union issued to Crowley, not the policy at

17   issue here -- actually says it isn't a claim unless and until

18   it's received by the insured.  But that requirement isn't in

19   this policy.

20           THE COURT:  Thank you.

21           MR. SHUGRUE:  Thank you, Your Honor.

22           THE COURT:  Thank you.

23           All right.  The motion is under advisement.  I will

24   issue an order as soon as I can.  We've done quite a bit of

25   work to get ready for it.  And I hope to have an opinion out

1  reasonably soon.

2         I will tell you we're pretty busy.  And, of course,

3  our criminal docket stays -- keeps us busy, so -- which gets

4  priority.

5         So I will do the best I can to get you a decision as

6  quickly as I can, but I won't predict exactly when that will

7  be.  I'll just tell you I'll do the best I can.

8         And the one question I did have before I let you-all

9  go is -- I saw that early on in the case -- I think you had

10  some engagement with Mike Tanner as a mediator.  And then I

11  think it showed -- let me make sure I'm not mixing my cases up

12  here.

13         I think it showed -- I then converted the motion to

14  dismiss to a motion for summary judgment.  Yeah.  Mike --

15  Mr. Tanner did a continuation notice on December 14th.  A week

16  later I converted the motion and then you-all were off to the

17  races.

18         But these are two business entities that want to make

19  business decisions.  And while this case is under advisement,

20  and sometimes a good opportunity to see if it could be

21  resolved, you've now both heard kind of the best shots from the

22  other side.  You don't know what the judge is going to do.

23         I will tell you, of course, I will do the best I can

24  to follow the law.  This is a relatively unusual case.  The

25  facts are kind of unusual.

1          And so it's not like I'm seeing a case directly on
2    point that says, Res judicata applies when there's an unsealed
3    criminal affidavit.  This doesn't appear to be a case like
4    that, and so -- or vice versa.
5          And so any decision I make, I assume, is likely,
6    depending on who -- somebody is going to like the decision,
7    somebody is not.  There's always the possibility of an appeal,
8    so -- anyway, I just wonder whether -- and I know there's a lot
9    of money involved.
10         But the thing about this that's good, as opposed to a
11   lot of other disputes I have, is -- this is a business dispute
12   between two very sophisticated business organizations.
13         This doesn't really -- this isn't really personal.
14   There's not -- shouldn't be personalities involved,
15   necessarily.  It really is just a business dispute that needs
16   to be resolved.
17         And if it can't be resolved with -- through
18   negotiation or mediation, then, of course, I will do my level
19   best to give you a proper decision.
20         So I guess my question is -- and I'll ask you,
21   Mr. Duffy, first.
22         In advance of a decision from the court, would
23   National Union be amenable to getting back in front of
24   Mr. Tanner, or, if -- if you wanted to, Judge Toomey -- the
25   magistrate judge would probably give you a settlement

1    conference, if I asked him nicely.

2           Is that something that National Union would be

3    interested in?  Is it something -- if you're not prepared to

4    say now, is it something that you could talk to your client

5    about and let us know?

6           What's your response to that?

7           MR. DUFFY:  Your Honor, I think I would have to talk

8    to my client before making any commitment.  But I suspect that

9    they probably would agree to do that.

10          THE COURT:  Okay.  Mr. Shugrue, what says Crowley?

11          MR. SHUGRUE:  I would say the same, Your Honor.  I'd

12   certainly have to talk -- Mr. Ficon is here, but he's got other

13   folks that he has to discuss that with.

14          But I would certainly engage in that discussion and

15   would not rule out the possibility of reengaging on the

16   settlement discussions.

17          THE COURT:  Okay.  Well -- and let me be clear with

18   everybody.  You know, I think sometimes courts get accused of

19   trying to cram settlement down people's throat.  And I'm not

20   doing that.  If y'all tell me you can't settle it, I'll decide

21   it, and I'm happy to do so.

22          It does strike me, though, that a lot of time and

23   money has already been spent.  Now everybody has kind of taken

24   their best shots at an argument, and everybody can kind of hear

25   what it sounds like.

1        And it also strikes me that every dollar -- every day

2   more dollars get spent on the matter, and will continue to be

3   spent.

4        And if there is some resolution of this that could

5   happen from a business perspective, it's probably not a

6   terrible idea.  And so I would encourage you-all to think about

7   that and to at least be open to that possibility.

8        So here's what I'll do.

9        Gosh, how did it get to be June 20th?

10       If I give you-all -- oh, that's the 4th of July.  If

11  I give you-all until, like, Friday, July 7th, or something, to

12  let me know whether the parties are willing to engage in --

13  that's a couple of weeks -- two-and-a-half weeks, but there's a

14  4th of July holiday.

15       If you need longer, I'm willing to give you longer.

16  I'm just trying to not be too long with it.  If I give you

17  until then or another date we agree on to (a) let me know

18  whether you're willing to proceed with settlement discussions

19  and (b) let me know whether you want to get back in front of

20  Mr. Tanner, or whether you would like me to ask the magistrate

21  judge to handle a settlement conference, or whether you have

22  somebody else you want to use -- any of that is fine with me.

23       Is that enough time?  Do you need a little extra

24  time?

25       Mr. Shugrue, what say you?

1      MR. SHUGRUE:  Your Honor, I think that's sufficient

2   time.

3      THE COURT:  Okay.  Is that enough?

4      MR. DUFFY:  That's plenty of time, Your Honor.

5      THE COURT:  Okay.  And so what I'm anticipating is a

6   joint notice saying the parties are willing to go forward with

7   settlement discussion and we request that the magistrate judge

8   conduct, or we request that Mr. Tanner, or that -- another

9   mediator that you pick.

10      If one party or another just doesn't think it's

11   worthwhile -- I hope that won't be the answer.  I really

12   don't -- because I think what can it hurt you, really?  And you

13   may be surprised.

14      But if one party really feels strongly, then I'm not

15   going to force you to do it, but I -- I'm going to really

16   encourage you to do it.

17      And I would ask -- ask your clients -- and in the

18   notice, I don't need to -- it doesn't need to be identified who

19   objects to it.  It just -- we're ready to go forward with it or

20   we're not ready to go forward with it.

21      But I'm going to ask you-all to talk to your clients

22   and encourage them to make that effort, because, you know,

23   we're still even in the middle stages of this thing.  I've got

24   to make a decision.  And then, depending on that, somebody

25   might want to appeal and -- so...

1        My senior partner, even though we -- I was in a

2  litigation firm before I became a judge, he used to -- the

3  first thing he would always tell clients when he came in is

4  that litigation is a terrible way to run a business.  And

5  that's kind of true, isn't it?  It's necessary sometimes, but

6  it's not -- not really what you want to be spending your time

7  on.

8        Of course, I know an insurance company is a little

9  different.  This is what you do.  Either you pay claims or you

10  don't.

11        But, still, it's certainly -- I know insurance

12  companies have very sophisticated ways of making calculations

13  about risk and reward and what makes sense and what doesn't.

14  So, hopefully, we can -- hopefully that can be brought to bear.

15  That's my hope, anyway.

16        So I'll hear from y'all by the 7th.  The matter is

17  under advisement.  And, as I said, I will write you an opinion,

18  if I need to, and -- but it will take me a little bit of time.

19        Once I hear whether settlement is going to go forward

20  or not, it will take me a little bit of time.  But I'll just do

21  the best I can and give you the best work that I can give you.

22        Anything else, Mr. Shugrue, from Crowley today?

23        MR. SHUGRUE:  No.  Thank you, Your Honor.

24        THE COURT:  Mr. Duffy, anything else?

25        MR. DUFFY:  No, Your Honor.  Thank you.

1          THE COURT:  Okay.  Good.  Well, it's good to see

2    everybody.  And I thank you for putting on a good show for our

3    interns.  And I'm going to go eat lunch with them in a minute.

4          So what I'll ask y'all to do is just sit right there.

5    I'm going to go back for a minute.  These folks are going to go

6    about their business.  I'll come back out and we'll talk for a

7    second.  Okay?

8          All right.  Thank y'all.

9      (The proceedings concluded at 11:51 a.m.)

10                        - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## **CERTIFICATE**

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA      )


      I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.


      DATED this 11th day of August, 2017.




             s/Shannon M. Bishop
             Shannon M. Bishop, RDR, CRR